OPINION OF THE COURT
Simons, J.
 Defendant Robert Brensic has been convicted by a Suffolk County jury of murder, second degree, and manslaughter, first degree, for his role in the asphyxiation death of 13-year-old John Pius. In an unrelated case, defendant Douglas Young has been convicted of rape, first degree, and two counts of robbery, second degree, stemming from his participation in an assault upon a woman which occurred on the grounds of the housing project in which he lived. Although others were similarly charged with the crimes arising from these two incidents, both defendants were tried alone and the common issue presented on these appeals is whether the trial courts *14 improperly admitted into evidence against them the custodial confessions of nontestifying accomplices. The defendants claim that the admission of such evidence as declarations against penal interest violated New York evidentiary law and denied them their rights of confrontation and due process under the Federal and State Constitutions. We agree that admission of the confessions violated the hearsay rule because neither satisfied the prerequisites for reliability set forth in People v Settles (46 NY2d 154) and People v Maerling (46 NY2d 289). Accordingly, we reverse the convictions and order new trials. Because our determinations rest on State evidentiary grounds, we do not reach defendants’ Confrontation Clause claims (see, Lee v Illinois, 476 US 530; Ohio v Roberts, 448 US 56).
I
Out-of-court statements introduced to prove the truth of the matters they assert are hearsay. They may be received in evidence only if they fall within one of the recognized exceptions to the hearsay rule, and then only if the proponent demonstrates that the evidence is reliable (see, People v Nieves, 67 NY2d 125, 131). In these cases the People contend that evidence was properly received as a declaration against penal interest. This exception to the hearsay rule recognizes the general reliability of such statements, notwithstanding the absence of the declarant to testify, because normally people do not make statements damaging to themselves unless they are true.
The exception has been recognized out of necessity and in the belief that the self-inculpating nature of the declaration serves as an adequate substitute for the assurance of reliability usually derived from the administration of an oath and the testing of the statements by cross-examination. Because these traditional guarantees are absent when out-of-court declarations against penal interest are offered, such evidence is admitted cautiously and only after reliability is firmly established (People v Thomas, 68 NY2d 194, 198; People v Geoghegan, 51 NY2d 45, 49; see generally, Fisch, NY Evidence § 891 [2d 1977]). As with all forms of hearsay evidence, a determination of the admissibility of a declaration against penal interest, focusing on the circumstantial probability of its reliability, must be made before it is received; the trial court must determine, by evaluating competent evidence independent of *15 the declaration itself, whether the declaration was spoken under circumstances which renders it highly probable that it is truthful (see, People v Shortridge, 65 NY2d 309, 312-313; see generally, Richardson, Evidence § 206, at 183-184 [Prince 10th ed 1973]; Goodman & Waltuch, Declarations Against Penal Interest: The Majority Has Emerged, 28 NYL Sch L Rev 51 [1983]; Fine, Declarations Against Penal Interest in New York: Carte Blanche?, 21 Syracuse L Rev 1095 [1970]). Thus, before statements of a nontestifying third party are admissible as a declaration against penal interest, the proponent must satisfy the court that four prerequisites are met: (1) the declarant must be unavailable to testify by reason of death, absence from the jurisdiction, or refusal to testify on constitutional grounds; (2) the declarant must be aware at the time of its making that the statement was contrary to his penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability (People v Thomas, 68 NY2d 194, 197, supra).
When the declaration is offered by the People to inculpate the defendant in a criminal trial — as distinguished from declarations offered by defendant to exculpate himself — it is subjected to even more exacting standards in recognition of the due process protections afforded defendants charged with crime including, of course, the requirement that guilt be established beyond a reasonable doubt (see, People v Thomas, supra, at 198; People v Maerling, 46 NY2d 289, 298, supra; see, Martin, Evidence: Declarations Against Interest, Confrontation, NYLJ, Jan. 9, 1987, at 1, col 1; at 2, cols 1, 2). In such instances, the trial court must find that the interest compromised is "of sufficient magnitude or consequence to the declarant to all but rule out any motive to falsify” (People v Thomas, supra, at 198). This standard raises a rebuttable presumption of unreliability when the inculpatory declaration is the result of custodial questioning because, in such circumstances, the declarant is likely to have a "strong motive to falsify” in order to curry favor, shift blame, receive immunity from prosecution or obtain a favorable plea bargain (see, People v Geoghegan, 51 NY2d 45, 49, supra; People v Settles, 46 NY2d 154, 166-168, supra; and see Richardson, Evidence op. cit. § 260, at 227-228; cf, Lee v Illinois, 476 US 530, supra). Indeed, some authorities hold that a third party’s statements against penal interest obtained during *16 custodial interrogation should never be received in evidence to inculpate a defendant (see, United States v Sarmiento-Perez, 633 F2d 1092, cert denied 459 US 834; Report, New Jersey Sup Ct, Committee on Evidence, at 170-171 [1963]; 4 Weinstein’s Evidence, United States Rules If 804 [b] [3] [03], at 804-156 [1985]; Comment, Declarations Against Interest-Rules of Admissibility, 62 Nw U L Rev 934 [1968]).
When the People seek to introduce the declaration against penal interest of an unavailable third party to inculpate a defendant, through the testimony of an in-court witness, and the defendant claims that such evidence is unreliable, the trial court should conduct a hearing, if there is any dispute concerning the circumstances, to determine whether the criteria for admissibility are actually satisfied (see, People v Thomas, 68 NY2d 194, 198, supra; People v Maerling, 46 NY2d 289, 299, supra). If the court decides to allow such evidence, it should admit only the portion of that statement which is opposed to the declarant’s interest since the guarantee of reliability contained in declarations against penal interest exists only to the extent the statement is disserving to the declarant (see, People v Thomas, supra, at 198 [where the statement — as redacted — did not directly implicate the defendant as a perpetrator of the crime for which he was being tried]; People v Geoghegan, 51 NY2d 45, 49, supra; People v Maerling, supra, at 298-299; and see, Richardson, Evidence op. cit. § 260, at 115 [1972-1985 Cum Supp]). Finally, when the trial court decides to admit a declaration against penal interest through the testimony of a third party, it should give a proper limiting instruction at the time such testimony is introduced and it should also instruct on the use of the evidence during its final jury charge (see, People v Thomas, 68 NY2d 194, 201, supra; see also, 4 Weinstein’s Evidence, United States Rules ff 804 [b] [3] [03], at 804-150 [1985]).
In the two cases before us we are unable to "all but rule out any motive to falsify” on the part of the nontestifying declarants (People v Maerling, 46 NY2d 289, 298, supra). That being so, the People failed to establish the reliability of their statements and it was error to permit the juries to consider them.
II
A
Defendant Robert Brensic has been convicted of killing John *17 Pius. The body was found the day after the homicide, on April 21, 1979, in a wooded area behind the schoolyard of the Dogwood Elementary School in Smithtown, New York, covered by two logs and some twigs and leaves. Forensic examination revealed that death was due to traumatic asphyxia, caused by physical injuries resulting from beating and kicking and by rocks placed in decedent’s mouth. Investigation led the police to Peter Quartararo, age 15, and Thomas Ryan, age 17. The police questioned the boys separately on April 28, 1979 and eventually obtained admissions and a confession from Peter Quartararo which inculpated Brensic. Peter’s confession was admitted at defendant’s trial and defendant contends receipt of that evidence constituted reversible error.
Before receiving the confession, the trial court properly conducted a hearing on admissibility at which the People presented Detective Palumbo to testify about the circumstances underlying Peter’s statements. After hearing this evidence and the legal arguments of counsel for both sides, the court determined that Peter’s confession, recited in his mother’s presence, met the Settles prerequisites and that it was admissible.
At the Settles hearing, Detective Palumbo testified that he questioned Peter for approximately two and a half hours about his knowledge of a certain suspect in the case, Michael O’Neill. Peter eventually told the police that, in fact, Thomas Ryan and defendant Robert Brensic had killed John Pius to prevent him from disclosing that Brensic, Ryan and the Quartararo brothers had stolen a minibike from a house on Brensic’s paper route. Peter admitted that he and his brother Michael were present at the schoolyard at the time of the killing, but stated that they had neither seen nor become involved in it. Palumbo and another detective then took Peter to the crime scene and asked him to. describe where these events had taken place. At that time, Peter gave a new account of the murder, indicating that he and his brother, Michael, had witnessed the murder of Pius by Brensic and Ryan and had helped to bury the body. Upon being told that he would have to testify in court about this, and that Thomas Ryan also had made admissions to the police, Peter gave a third version of the homicide that implicated himself and his brother Michael, as well as Ryan and Brensic. It was then approximately 6:30 p.m. and, for the first time, Peter was given Miranda warnings. He waived his rights because he "wanted to tell the whole thing and get it off his chest.” While *18 walking back to the squad car, Peter recounted the events surrounding the death of John Pius again, but this time he identified Brensic as the person who wanted to make sure Pius did not "rat out” the four for the theft of the minibiké; as the person who started the fight with Pius; and as the person who directed that rocks be shoved down decedent’s throat "to shut him up.”
After leaving the schoolyard, the police attempted to contact Peter’s mother but were unsuccessful. They took Peter to McDonald’s for dinner and then proceeded back to the juvenile service unit. In the meantime, Mrs. Quartararo had called the precinct about her missing son and apparently was not told that he was being questioned by the police. At approximately 8:00 p.m., the police reached Mrs. Quartararo by telephone, informed her of the events which had transpired, and requested her to bring her son Michael to the juvenile service unit. She agreed to do so and, when she and Michael arrived, at approximately 8:30 p.m., the Quartararo brothers and their mother were advised of their Miranda rights. They waived them and agreed to speak without the presence of an attorney. Michael was then asked to leave the room and the arresting officer asked Peter to tell his mother, in his own words, what had happened. Peter gave an account of the circumstances surrounding the death of John Pius in which he admitted his own active involvement, that of his brother Michael, and that of Thomas Ryan and defendant Robert Brensic. After he related his story to his mother, Michael Quartararo was brought back into the room and told of his brother’s confession. Michael vehemently denied any involvement in the killing, although he admitted a part in the stealing of the minibike. Peter Quartararo thereafter recanted his confession and denied any involvement in Pius’ death, telling the police he had fabricated the story because he "thought you guys would let me go.” Mrs. Quartararo, and later Mr. Quartararo, spoke alone with Peter in an attempt to persuade him to reaffirm his confession and not be intimidated by his brother Michael, but Peter refused. The Quartararo boys were released, without charge, at approximately 5:45 a.m. on April 29, 1979. Prior to leaving the precinct, Peter spoke alone with Palumbo and another detective telling them "I’ll tell the truth only if Michael will tell it first. Only if Michael will tell what happened first.”
Defendant Brensic and the Quartararo brothers were indicted in December 1979 and Ryan some months later. Bren *19 sic’s case was subsequently severed for trial. Defendant’s first trial ended in a mistrial during the presentation of the People’s case. At the second trial, the People sought to introduce Peter Quartararo’s confession against defendant but Quartararo had been convicted of murder, second degree, in the separate trial and, since his appeal was then pending, he refused to testify. Consequently the People sought to introduce his statements through the testimony of Detective Palumbo. Following the Settles hearing previously discussed, the trial court ruled that only the custodial confession made in the presence of Mrs. Quartararo was admissible as a declaration against penal interest.[1] The court ordered that the statement be redacted to remove references to defendant and the other alleged accomplices. The court gave the jury a limiting instruction before Detective Palumbo testified about the confession, and later, in its charge, the court instructed the jury that Peter Quartararo’s statements could not be considered as evidence of defendant’s guilt, but could only be used to "test the credibility and reliability of other testimony and evidence and to corroborate the testimony of other witnesses in this case.”
On appeal, the Appellate Division determined that, given the prosecutor’s suggestion during summation that the jury consider the confession as corroborating evidence of Brensic’s guilt — coupled with the court’s instructions to the jury — the jury was clearly led to believe it could consider the confession as primary evidence of defendant’s guilt. Hence, admission of the statements raised hearsay and confrontation issues. Nonetheless, the Appellate Division determined that the confession was properly admitted as a declaration against penal interest; that the statement had been properly redacted; and that defendant’s right of confrontation was not violated by admission of the statements. Accordingly, it affirmed defendant’s conviction.
We agree with the Appellate Division that, given the prosecutor’s remarks during summation and the court’s instruction in its jury charge, the jury was led to believe it could use Peter Quartararo’s confession as substantive evidence of de *20 fendant’s guilt. Because introduction of the statement through the testimony of Detective Palumbo constituted hearsay, it was properly admitted only if the circumstances surrounding the confession satisfied the prerequisites of a declaration against penal interest as we have stated them. Because we hold that they did not, and that the error was not harmless, we reverse the order of the Appellate Division, vacate defendant’s conviction and grant a new trial.
In its oral ruling on admissibility, the trial court did not determine whether, at the time of the confession, Peter Quartararo had a motive to falsify. In a later written decision, it addressed that issue and found that, once Peter’s mother arrived at the precinct, his obvious motives for falsification no longer became paramount and it was "reasonable to conclude that the statements forthcoming were reliable and worthy of belief’ (People v Brensic, 118 Misc 2d 390, 400). The Appellate Division agreed with this analysis. We conclude, however, that the evidence before the court not only failed to establish the reliability of Peter’s confession, it suggested quite the contrary, that he had a strong motive to fabricate when he confessed to his mother. Accordingly, the confession was unreliable as a matter of law and should not have been received in evidence.
First, the confession was the product of the custodial questioning of a 15-year-old boy for six and a half hours, without his parents’ knowledge, by two police detectives. In the course of this interrogation, Peter gave numerous versions of the events that led to John Pius’ death. In the first account, he clearly attempted to shift the blame by identifying defendant and Thomas Ryan as the murderers, and he claimed that he and his brother did not even see the crime (compare, People v Thomas, 68 NY2d 194, 199-200, supra; People v Geoghegan, 51 NY2d 45, 49-50, supra). Gradually, however, under continual questioning Peter admitted that he and his brother watched the murder and helped bury the body. In none of these versions did he implicate himself in the killing sufficiently for the police to give him Miranda warnings. Finally, he admitted that he and his brother participated in the actual killing, as well, although defendant was clearly identified as the instigator and ringleader. Peter’s admissions became increasingly self-inculpatory as the interrogation wore on, but there is no guarantee that the later version of the killing, recounted in his mother’s presence and implicating defendant, was the accurate one or that the earlier motive to shift blame was not *21 still operative. Certainly his mother’s presence did not automatically insure reliability. Indeed, it is at least possible that a teen-ager who confesses in front of his mother that he and his brother killed a young boy would seek to minimize the degree of their participation and responsibility — particularly when his "difficult younger brother”, as his parents described him, is waiting outside the room. That Miranda warnings were administered to Peter prior to his inculpatory admissions and again prior to this confession — and that the confession was later determined to be voluntary because of their waiver —is not dispositive of the question of reliability. As the Supreme Court recently observed, a finding that a confession was voluntary for Fifth Amendment purposes does not bear on the question of whether the confession was also free of any desire, motive, or impulse to mitigate one’s own culpability by spreading blame or by overstating the involvement of an accomplice (see, Lee v Illinois, 476 US 530, 543-545, supra).
Next, there is evidence that certain events occurred after Peter Quartararc’s confession to his mother which further undermine its reliability. For example, when his brother refused to admit any involvement in the murder, Peter recanted his confession. Although the People point to Peter’s statement to police that "I’ll tell the truth only if Michael will tell it first” as evidence that the now-recanted confession was reliable, there is no guarantee that the "true” version the brothers might have told would have implicated defendant as did the confession Peter recited to his mother.
Finally, there is evidence in the record to support the inference that Peter did not fully realize that his various admissions and confessions were contrary to his penal interest. He admitted participation in the murder after Detective Palumbo told him in the schoolyard that Brensic and Ryan would be tried for murder, and that he would have to testify against them. He then replied "I may as well tell the truth.” Thus, the possibility exists that Peter thought that only defendant and Ryan would be charged, and his involvement would be limited to testifying as a prosecution witness. Following Peter’s confession, he and his brother were not charged, ánd when they left the precinct the police expected that they would cooperate with the investigation. Moreover, there is no evidence that Peter Quartararo was specifically told that, if he confessed, he would be tried for murder. Palumbo testified that he did not tell Peter he would go to jail for what he was *22 admitting. Significantly, on cross-examination at the admissibility hearing Palumbo stated that, prior to his recantation of the confession, Peter pleaded with his brother to confess saying "Mike, I told him everything. Please tell the cops. Please tell him everything. Let’s get out from under this” (emphasis supplied). There also was evidence that, after his son recanted his confession, Mr. Quartararo urged him to tell the truth "to save your skin”.
Given this substantial evidence that the confession was but one of several, each containing material differences, that it was obtained from a juvenile after lengthy custodial questioning and that it was given under circumstances which suggest that it was induced by the hope of leniency, the confession should not have been placed before this jury as evidence of defendant’s guilt. Nor is the argument for reliability stronger because part of Peter’s confession was consistent with other evidence before the jury. The test is whether the confession was truly against the declarant’s penal interests and the People failed, as a matter of law, to establish in this case that it was.
Moreover, the error in admitting the confession cannot be deemed harmless because there is a significant possibility that the jury would reasonably have acquitted defendant had the confession not been admitted (see, People v Crimmins, 36 NY2d 230, 242). There was no physical evidence connecting defendant to the killing.[2] The only other evidence offered at trial that directly implicated him was the testimony of two witnesses who recounted purported admissions of defendant concerning his participation in John Pius’ death, and the testimony of a third witness who related an alleged confession made by defendant while in the county jail. Each of these witnesses presented credibility problems, but the jury was invited to use the evidence of Peter Quartararo’s confession to bolster their credibility and to corroborate their testimony.
B
In People v Young, the issue is presented in a slightly *23 different posture. In Young, the court did not conduct a Settles hearing, although defendant objected to admission of the evidence. Thus there is no record of the circumstances under which the inculpatory statements were acquired, and we are unable to rule on reliability as a matter of law.
Defendant Douglas Young and three of his friends were charged with various crimes arising from the rape and robbery of 50-year-old Teresa Ocasio at approximately 3:00 a.m. on October 9, 1982. The incident occurred behind a building in the housing project in which defendant lived and was observed by two eyewitnesses who later identified the four assailants. Defendant and Jerome Portis were arrested on October 13, 1982 and taken to the police station for questioning. Detective Foley, who was assigned to investigate the crime, questioned defendant first. After being apprised of his constitutional rights, defendant gave an oral statement indicating that he had observed portions of the attack on Ms. Ocasio, but did not participate in it. Defendant then gave the police a handwritten statement, as did each of the other suspects.
All four defendants moved to suppress their statements and a Huntley hearing was held on their motions. After the testimony of Detective Foley was completed, David Littles and Jerome Portis each pleaded guilty to one count of robbery, first degree, in satisfaction of all seven counts in the indictment against them. Following the presentation of all the evidence, but before the court’s ruling on the suppression motions, Willie Portis similarly pleaded guilty to one count of robbery, first degree. Defendant declined to plea bargain, and his motion to suppress his statements to Detective Foley was denied.
Defendant came to trial before a Judge who had not presided over the Huntley hearing or the codefendants’ plea allocutions. Prior to trial, the People moved for a ruling permitting the admission of the accomplices’ statements on its direct case as evidence of the occurrence and nature of the crimes in which defendant was alleged to have participated. After hearing legal arguments from counsel on the motion, but without taking any evidence, the court ruled that the statements were admissible if properly redacted. On the first day of trial, defense counsel renewed his objection to the admission of the accomplices’ statements, arguing that no evidence had been taken concerning the circumstances surrounding them. Defense counsel also contended that the state *24 ments had not been properly redacted, that they would link defendant to the crime, and that admission of the statements would violate defendant’s right of confrontation.
In fact, only David Littles’ confession was admitted into evidence at defendant’s trial. As developed at the Huntley hearing, Littles’ oral and written statements had been taken by Detective Foley several hours after the arrest of defendant and Jerome Portis when Littles had come voluntarily to the police station for questioning and, upon his arrival, saw defendant and Jerome Portis detained in cells. His written confession implicated defendant in the attack.
The parties had stipulated that Littles was unavailable to testify at defendant’s trial because he intended to invoke his privilege against self-incrimination if called. Hence, the confession, as redacted, was admitted through the testimony of Detective Foley without a limiting instruction by the court. Upon being asked if this statement was the sum and substance of David Littles’ statement, Detective Foley said it was not, "The Court said I can’t read”. The prosecutor cut off the witness’ response. Defense counsel’s motion for a mistrial was denied, and the court instructed the jury that they had heard all they were legally entitled to hear of the statement. During summation and without defense counsel’s objection, the prosecutor several times referred to Littles’ confession as evidence upon which the jury was entitled to rely as direct evidence of defendant’s active involvement in the crimes. Although defense counsel asked for an instruction that Littles’ confession could not be used to directly inculpate defendant, but rather only to show that more than one person participated in the crime, the trial court did not give this requested charge. Rather, after discussing how the jury should assess the credibility and weight of Littles’ statement, the court instructed the jury that it could consider the statement as substantive evidence of guilt but that it must be corroborated. The jury convicted defendant of rape, first degree, and two counts of robbery, second degree. On appeal, the Appellate Division affirmed the convictions, holding that Littles’ confession was admissible because it was clearly against his penal interest, the redacted statement did not clearly inculpate defendant, and there were sufficient "indicia of reliability” to survive a Confrontation Clause challenge. We disagree.
Given the remarks of the prosecutor during summation, and the trial court’s instructions to the jury, it is clear that the *25 jury was invited to consider the written confession of David Littles for the truth of the matter asserted in it. Consequently the confession constituted hearsay and was inadmissible unless it satisfied the criteria for the admission of declarations against penal interest (see, People v Settles, 46 NY2d 154, supra; People v Maerling, 46 NY2d 289, supra). In contrast to the procedure followed in Brensic (supra), the Trial Judge did not conduct an inquiry into the circumstances surrounding David Littles’ confession but, instead, ruled that the availability of Detective Foley at trial, through whom the confession would be introduced, would substitute for a cross-examination of Littles.
The trial court’s ruling was erroneous, because a hearing to determine admissibility is required whenever there are unresolved factual issues concerning the reliability of the proffered statement (see, People v Thomas, 68 NY2d 194, 198, supra; People v Maerling, supra, at 299). In this respect, declarations against penal interests differ from other hearsay statements, such as dying declarations or spontaneous declarations, which are also exceptions to the general rule (cf., People v Egan, 78 AD2d 34). The reliability of declarations against penal interest is predicated entirely on their disserving character and, as we have recognized many times, they may be uttered for a variety of motives, many of them for the declarant’s benefit. Thus, an inquiry is generally required to resolve whether the statement was in fact against the declarant’s interest (see, People v Thomas, 68 NY2d 194, 198, supra) and that the declarant was not motivated by factors casting doubt on its reliability (see, e.g., People v Shortridge, 65 NY2d 309, supra). It is important to know, for example, the relationship of the declarant and the witness, whether the statement was made under the constraints of custodial questioning or spontaneously to disinterested parties, whether it was made to hurt an enemy or help a loved one. Moreover, defendant may assert grounds to believe that the declarant suffers from emotional or psychological instability or is a pathological liar (see, id., at 313). The evaluation of reliability is a matter entrusted to the trial court, and it is only after a determination of admissibility is made that the jury may assess the credibility of the third-party witness whose statement has been introduced (see, People v Settles, 46 NY2d 154, 170, supra; and see, People v Thomas, supra, at 199).
The trial court did not make such a determination here and there is sufficient evidence to hold that it should have done so. *26 Judging from the evidence at the Huntley hearing (which the Trial Judge did not hear and apparently did not consider) and the evidence at trial, David Littles was under arrest at the time he gave his written statement, raising the presumption of the unreliability of his custodial confession (see, People v Geoghegan, 51 NY2d 45, 49, supra; People v Settles, supra, at 166-168). He confessed after seeing his alleged accomplices Jerome Portis and defendant Douglas Young in detention at the police station, suggesting that defendant’s inculpating statement was made at a time that Littles had a motive to falsify his account to spread blame or curry favor (compare, People v Thomas, 68 NY2d 194, 200, supra). Finally, Littles’ statement at his plea allocution differed from the admitted confession in its detail of defendant’s participation in the robbery. These were matters which required that the court either deny the motion to use the confession or, at least, hold a hearing to examine the surrounding circumstances for the purpose of determining reliability.
The error in admitting Littles’ confession against defendant as a declaration against penal interest cannot be deemed harmless (see, People v Crimmins, 36 NY2d 230, 242, supra). As in the Brensic case (supra), the jury was invited to use the statement to support other evidence adduced at trial directly implicating defendant in the crimes. Apart from the confession, the only evidence of defendant’s active and intentional participation in the rape and robbery is found in the testimony of the victim and of one eyewitness, and both of these accounts were impeached by the prior inconsistent statements they had made.
Accordingly, in each case, the order of the Appellate Division should be reversed, the conviction vacated and a new trial ordered.
Chief Judge Wachtler and Judges Alexander, Titone, Hancock, Jr., and Bellacosa concur; Judge Kaye taking no part.
In each case: Order reversed, etc. [See, 70 NY2d 722.]

. Prior to Peter Quartararo’s trial, the court held a Huntley hearing on his motion to suppress the admissions and confessions. The suppression court ruled, inter alia, that Peter Quartararo’s confession in his mother’s presence, was admissible. The Appellate Division agreed (see, People v Quartararo, 113 AD2d 845, 848). Leave to appeal to this court was denied (66 NY2d 921).

. Because our determination in this case is based on the improper admission of Peter Quartararo’s confession as a declaration against penal interest, we do not reach defendant’s claim that the prosecutor’s suggestion during summation that defendant had destroyed a pair of sneakers that would have linked him to the murder — a claim which was unsupported by any evidence adduced at trial — deprived him of a fair trial.